_____

ROSEMARIE VITO,

                           Plaintiff,                No. 07-CV-6500 CJS

    -vs-

                                       DECISION AND ORDER

BAUSCH & LOMB, INCORPORATED,

                           Defendant.

_____

APPEARANCES

| | |
|---|---|
| For Plaintiff: | Christina A. Agola, Esq. |
| | 2100 First Federal Plaza |
| | Rochester, New York 14614 |
| | |
| For Defendant: | Laura H. Harshbarger, Esq. |
| | Peter A. Jones, Esq. |
| | Bond, Schoeneck & King |
| | One Lincoln Center |
| | Syracuse, New York 13202 |

INTRODUCTION

This is an action alleging employment discrimination and retaliation pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. § 2000e *et seq.*, the New York Human Rights Law ("NYHRL"), Executive Law § 290 *et seq.*, and 42 U.S.C. § 1981 ("Section 1981"). Now before the Court is Defendant's motion for summary judgment. (Docket No. [#16]). For the reasons that follow, Defendant's application is granted and this action is dismissed.

BACKGROUND

Unless otherwise noted, the following are the undisputed facts of the case, viewed in the light most-favorable to Plaintiff. Plaintiff is a female of Filipino ancestry. Plaintiff was born in the Philippines and moved to the United States in 1997. Defendant is a manufacturer of contact lenses and eye-care products.

In January 2005, Plaintiff began working in Defendant's Pure Vision department, inspecting contact lenses and packaging, and earning approximately twelve dollars per hour. The work was unskilled and repetitive, and involved operating a machine. Plaintiff was assigned to the D Shift, which worked from 6 PM to 6 AM. Plaintiff remained on D Shift for approximately ten months, between January 2005 and October or November 2005. Plaintiff's supervisor on D Shift was Rich Goodburlet ("Goodburlet"). D Shift employees were of various nationalities and races, but Plaintiff was the only Filipino. Plaintiff's co-workers included a female, Deb Rock ("Rock"), and a male, Mehmet Chaglayan, who was called M1 ("M1"). Rock worked at a machine approximately four feet away from Plaintiff's machine, and M1 also worked nearby. (Pl. Aff. at ¶ 18). When Plaintiff began working on D Shift, M1 was employed as a temporary employee.

In April 2005, Plaintiff was sitting at her workstation when Goodburlet approached her from behind and "pressed his body" against Plaintiff. According to Plaintiff, at the time, Goodburlet was "looking on control borate machine" [sic], referring to the machine at which Plaintiff was working. (Plaintiff's Appendix of Exhibits, Vol. II, Exhibit T, entry dated March 15, 2005). In other words, Goodburlet's body touched Plaintiff's body as he was looking at Plaintiff's machine. Plaintiff's work area was cramped, since it was designed for one person. Plaintiff described the incident as follows:

> I was inspecting in my station. It's just a small chair. And there is a table here where the tray comes. I just noticed I was pushed on my station like that (indicating), the body behind my back. And I tried to move this side (indicating), but I cannot move, because there's a table here (indicating). We just have a limited space. Then when I moved like that, his body's touching all of this [indicating her side and back].[1] And I look at him in a bad look, and he's just smiling and ignores. So, I tried to move to this side (indicating). I don't know what happened. I don't know how long I had been in that position. I don't know when he leave. When left. I don't know. I just press in that position.

(Plaintiff's Deposition at 58). On two other occasions, Goodburlet touched Plaintiff's shoulder and "smiled sarcastically." (See, Plaintiff's Appendix of Exhibits, Vol. II, Exhibit E at 7; Exhibit T, entries dated March 23, 2005 and April 3, 2006) (Referring to Goodburlet "twice touching my arms [on] different day[s]."). On another occasion, Plaintiff became startled when Goodburlet rang a bicycle bell in a hallway, apparently in an attempt to tease Plaintiff. Another time, Plaintiff commented that a pair of safety glasses did not fit her face, to which Goodburlet responded, "Do something about your face!". (Pl. Appendix of Exhibits, Vol. II, Exhibit T, entry dated August 18, 2005) ("I tell Rich 'this safety glass doesn't fit because I have a round face and high cheek bone. Rich tell me, 'Do something about your face!'").

On another occasion, Goodburlet, Rock, and several other co-workers were standing in a group, and asked Plaintiff, who speaks with a thick accent, to come over and read a statement aloud from a piece of paper. Plaintiff read the statement aloud, but did not understand it. Plaintiff now maintains that the document contained the word "fucking." (Pl. Aff. at ¶ 52). However, Plaintiff made contemporaneous notes concerning this incident which do not mention the word "fucking." Specifically, Plaintiff's

---

[1] *See*, Plaintiff's Deposition at 63.

contemporaneous notes state:

> The paper pushes in front of me. Emine ask me to read. I ask them why? Rich [Goodburlet] is giggling and he tells me to read what is written on the paper. I'm reading what is written on the paper, 'So Fa ...' I can not remember the whole sentence because it is not understandable. After reading the whole sentence, Rich Goodburlet running around laughing so hard. I'm standing and wondering why and what is going on?

(Pl. Appendix of Exhibits, Vol. II, Exhibit T, entry dated August 22, 2005). In any event, Plaintiff maintains that Goodburlet and the others began laughing, and when Plaintiff asked why they were laughing, two co-workers, "Amon" and "Asha," told her, "You are so crazy." (*Id*.). According to Plaintiff's notes, Goodburlet also asked a male employee named Paul to read the same document. (*Id*.) ("Few minutes before end of shift. I talk to Paul; he is telling me that Rich is asking him to read the paper too.").

On another occasion, Rock told Plaintiff that she had a sexual relationship with Goodburlet, and that M1 was aware of the relationship. Subsequently, M1 told Plaintiff that Rock, who was absent from the office that day, had telephoned and was "having sex."

At another time, M1 showed Plaintiff a piece of paper with the number "69" written on it, and asked Plaintiff if she understood the sexual meaning of the number. On another occasion, M1 threw a roll of tape at Plaintiff, hitting her on the head. When Plaintiff asked M1 if he had thrown the tape, M1 began "giggling." On another occasion, M1 commented to Plaintiff that a female employee named Karen wanted to have sex with him. (Plaintiff's September 22,2 008 Dep. at 97; see also, Pl. Appendix of Exhibits, Vol. II, Exhibit T, entry dated October 17, 2005: "I hear M1 saying 'Rose, Karen wants to have sex with me.' I turn around and saw Karen standing at my work station. Karen

4

response 'Rose, don't listen to him.' M1 laugh so loud."). Plaintiff responded by asking M1 if he "was drunk," to which he laughed. Subsequently, M1 grabbed a piece of "mold tubing" and, directing his gesture at Rock, began licking it and saying "something about vibration." (Plaintiff's Affidavit at ¶ 74). On another day, M1 commented to a group of employees that included Plaintiff that he had sex with a female coworker named Melanie. (Pl. Aff. at ¶ 95; see also, Pl. Appendix of Exhibits, Vol. I, Ex. A at 145).

Plaintiff also maintains that unidentified co-workers "picked on" her, "mimicked" her, and were "rude." (Pl. Counterstatement of Facts, ¶ ¶ 99-100).

Plaintiff complained to her Team Leader, "Liz," about Goodburlet, Rock, and M1. Subsequently, Liz met with Plaintiff and Goodburlet. Plaintiff complained about Goodburlet ringing the bicycle bell, and about M1 showing her the paper with the number 69 written on it. (Plaintiff's Aff. at ¶ 80). According to Plaintiff, Goodburlet responded by "laughing and giving [her] looks." (*Id*. at ¶ 81). Apparently, Liz took no action in response to Plaintiff's complaint.

In or about August 2005, Plaintiff complained to James Faville ("Faville"), Defendant's Manager of Human Resources. Subsequently, Faville, along with Goodburlet's supervisor, Bob Lazarevski ("Lazarevski"), met with Plaintiff. Plaintiff stated that several months earlier, Goodburlet, Rock, and M1 had involved her in a joke of a sexual nature. She further stated that Goodburlet was harassing her. According to Faville, Plaintiff told him that Goodburlet had touched her one day while trying to get by her, and had startled her by ringing a bicycle bell. Plaintiff also told Faville that Goodburlet stared at her and was unfriendly. (Faville Aff. ¶ ¶ 9-10). Subsequently, Lazarevski met with Rock and M1, and told them that Plaintiff was offended by their

jokes, and to stop such behavior. Faville and Lazarevski also met with Goodburlet, and explained Plaintiff's complaints. Goodburlet stated that he recalled the bicycle bell incident, but did not recall touching Plaintiff. Faville and Lazarevski concluded that Goodburlet was not harassing Plaintiff, and they told her so. Faville and Lazarevski also told Plaintiff that they had warned Rock and M1 to discontinue any sexual jokes.

Plaintiff was not satisfied, and requested a meeting between herself, Faville, Lazarevski, and Goodburlet. At the meeting, Plaintiff repeated her earlier complaints, and stated that Goodburlet was not a good supervisor. After excusing Goodburlet from the meeting, Faville and Lazarevski asked Plaintiff what she wanted them to do, and she responded that she wanted them to fire Goodburlet. Approximately two weeks later, Plaintiff again contacted Faville, to ask what was going to happen to Goodburlet. Faville explained that the investigation was finished and that he was not going to take any further action.

After her meeting with Faville and Lazveroski, Plaintiff contends that M1 and Rock "continued harassing her," by talking about her, looking at her, giggling, and "blocking her work area" so that co-workers could not get to her work station. (Pl. Aff. at ¶ 92).

Shortly thereafter, Plaintiff voluntarily transferred to a different shift, the C Shift, where she performed the same job. After Plaintiff transferred to C Shift, she no longer worked directly with Goodburlet, Rock, or M1, though she sometimes saw Rock and M1 when they worked overtime. Plaintiff states that even after transferring, she "still suffered harassment." In that regard, she states that on one occasion, Asha, a Turkish co-worker from D Shift, "gave her a hard time" about a contact lens that Plaintiff had inspected. (Pl. Aff. at ¶ 108; Pl. Appendix of Exhibits, Vol. I at 126).

6

In February 2006, Plaintiff applied for and received a position in Defendant's Microbiology Department, earning fifteen dollars per hour. In that regard, Brian David ("David"), the Microbiology Manager, interviewed Plaintiff and a white male for the position, and hired Plaintiff. (David Aff. ¶ 7). The Microbiology Department was located in a different building than the Pure Vision Department. The Microbiology Department performed research, development, and quality testing of Defendant's products. Plaintiff's duties in the Microbiology Department included making sterile solutions. In the Microbiology Department, David was Plaintiff's immediate supervisor. Another supervisor was Sue Beaver ("Beaver").

Plaintiff states that Beaver trained her, but not adequately. (Pl. Aff. at ¶ 110). On that point, Plaintiff states that, "Beaver was not a good trainer because she left me alone and when I would have questions she would tell me she had things to do." (Pl. Aff. at ¶ 112). Plaintiff adds that other employees would "help [her] and train [her]." (*Id*. at ¶ 112). However, David maintains that Plaintiff's job was not difficult to learn. In that regard, David states that persons working in Plaintiff's position usually become "fairly proficient" "within a week or so, and by two weeks into the job, [are] able to handle the job fully and competently[.]" (David Affidavit at ¶ 9). David states that Beaver gave Plaintiff "an initial few days of intensive training," and then "continued to look in on [Plaintiff] and offer her assistance as she could." (*Id*. at ¶ 10). According to David, such training method was the same method used with other employees. (David Aff. at ¶ 10) ("This is the model we have used training other individuals in the [lab]. Additionally, Ms. Vito was free to (and often did) ask questions of others in the department, and they, too, offered her guidance."). David further states that Beaver "devoted far more time out of her own

7

research schedule (for Ms. Beaver had her own job to do as well) to assisting and instructing Ms. Vito than any other person we had trained in the [lab]." (David Aff. at ¶ 15).

During the relevant time, the Microbiology Department was especially busy, because it was "responding to an international fungal keratitis problem" with contact lens products, and was attempting to discover whether the keratitis outbreak was connected to Defendant's products.  In a written submission to the Equal Employment Opportunity Commission ("EEOC"), Plaintiff acknowledged that her workload was heavy because of the keratitis problem: "I'm overloaded of work because of Fusarium (Fungal infections) increased of workload.  And for the entire problem going on about the Fungal Keratitis, employees are doing biochemistry scenarios 'trying some worst case according to Brien' and workload increased." [sic] (Pl. Appendix of Exhibits, Vol. II, Ex. T at 4).  Plaintiff had trouble keeping up with researchers' demands for sterile solution, and told David that she needed help because she was "getting backed up," and was not being given enough lead time to prepare orders. (Plaintiff's Aff. at ¶ 118).  David immediately issued an email directing employees to get their orders to Plaintiff as early as possible. (*Id.* at ¶ 123). David also had another employee, Todd Bassage ("Bassage"), assist Plaintiff and re-train her regarding her work procedures.  Nevertheless, David saw "fairly quickly that [Plaintiff] was not picking up on the job as quickly as [he] had hoped[.]" (*Id.* at ¶ 11; *see also, id.* at ¶ 13: "We desperately needed a person . . . who could 'hit the ground running.'  Unfortunately, Ms. Vito turned out not to be this person.  Even after nearly two months, Ms. Vito continued to lag behind in her ability to process the . . . work and produce a sufficient quantity of media." ).  According to David, by mid-April 2006, Plaintiff

was only producing about half of the product that was required by the lab technicians, while other employees "before and since Ms. Vito [were] able to [produce the needed quantity]." (*Id*. at ¶ 18).  In fact, in May 2006, while Plaintiff was on vacation, Bassage filled in for her and had no difficulty producing the required amount of product. (*Id*. at ¶ ¶ 22-23).

In addition to feeling overburdened with work, Plaintiff felt that she was mistreated in the Microbiology Department.  For example, Plaintiff complained that her work cubicle was smaller than some other employees' cubicles, and that she did not have a computer in her cubicle.  However, Plaintiff did not use a computer as part of her job, and performed most, if not all, of her work outside of her cubicle.  Moreover, the reason Plaintiff wanted a computer was so that she could access email during her lunch break. (Pl. Appendix of Exhibits, Vol. I, Ex. B at 81).  Plaintiff's predecessor, a white female, used the same cubicle and also did not have a computer.  Nevertheless, Plaintiff believed that she was denied a computer as part of a plan to discriminate against her:

Q. Why do you think you did not have a computer in Microbiology?

A. Because they don't want to give me a computer.

Q. Why didn't they want to give you a computer?

A. Because they don't want me to know.

Q. They don't want you to know what?

A. Other stuff.  They discriminate me.

(Pl. Appendix of Exhibits, Vol. I, Ex. B at 79).

Plaintiff also states that Beaver and another employee, Patricia West ("West"), laughed at her when she spoke: ""Anything I say, they just laugh." (Pl. Appendix of

Exhibits, Vol. I, Ex. B at 78). Plaintiff also felt that Beaver was rude to her, because she slammed a file cabinet, and was "rude" to Plaintiff, after Plaintiff refused to work overtime on one occasion. (Pl. Aff. at ¶ 126; Pl. Appendix of Exhibits, Vol. I, Ex. A at 170-172).

Plaintiff further alleges that David touched her breast during a meeting. (Pl. Aff. ¶ 135) ("Supervisor David pulled his chair next to mine and was on my side and placed his hand on my shoulder when his right hand slipped down and touched my right breast."). However, Plaintiff's statements on that point are contradictory. For example, Plaintiff told the EEOC that David touched her *arm*. (Pl. Appendix of Exhibits, Vol. II, Ex. E, at 4, 10). Similarly, in a deposition held on September 22, 2008, Plaintiff testified that David touched only her left shoulder. (Pl. Appendix of Exhibits, Vol. II, Ex. A at 174-175, 185). However, during a continuation of the deposition six months later, Plaintiff stated that David touched her breast as he was touching her arm and shoulder. (Pl. Appendix of Exhibits, Vol. II, Exhibit B at 43, 48-49). Plaintiff states that she did not mention the breast incident sooner because she was embarrassed. (*Id*. at 52). Plaintiff admits that she never told the EEOC or any of her supervisors about David allegedly touching her breast. David denies ever touching Plaintiff's breast. (David Aff. at ¶ 29).

In April 2006, Plaintiff called Defendant's employee Ethics Line, and essentially reiterated the complaints that she had made to Faville and Lazarevski. (Faville Aff. at ¶ 26). Specifically, Plaintiff complained about the earlier alleged harassment by Goodburlet, Rock, and M1 when she was working on D Shift. Plaintiff also complained that she was having problems in the Microbiology Department. Specifically, she complained that her cubicle was too small, and that she did not have a computer in her

cubicle.  Plaintiff further stated that she was having difficulty with the increased workload, and that she thought that her supervisors' expectations were too high. Additionally, Plaintiff complained that Beaver spoke rudely to her. (Faville Aff., Ex. D). Kassandra Reed ("Reed") investigated Plaintiff's complaints.  With regard to her complaints about D Shift, Plaintiff told Reed that after she transferred to C shift, she did not have any further problems with her co-workers from D Shift. (Faville Aff., Exhibit D). Reed concluded that Faville and Lazarevski had handled Plaintiff's earlier complaint appropriately, and she advised Plaintiff of that fact.  As for Plaintiff's complaints about the Microbiology Department, Reed directed them to Christopher Parsnip ("Parsnip"), Director of Human Resources.

On or about April 26, 2006, Parsnip met with Plaintiff.  Parsnip describes the meeting as follows:

> Ms. Vito told me that Mr. David had told her that the quality and quantity of her work was not meeting expectations.  Ms. Vito said this conversation upset her.  Ms. Vito said she believed his expectations were too high.  Ms. Vito said that Mr. David expected her to make 48 racks of DEB media per day but that she though 24 racks was as much as could be produced in a day.  Ms. Vito also did not like that Ms. Beaver told her how much of each media to make each day.  Ms. Vito acknowledged that Mr. David had assigned another coworker, Todd Bassage[2], to retrain her on skills and to assist her with the workload, and that the two of them had been working as a team in the [lab] for the past few days.  Ms. Vito seemed appreciative of Mr. Bassage's assistance.

(Parsnip Aff. at ¶ 5).  Parsnip told Plaintiff that she should talk with David about his expectations, and that he would be willing to meet with both Plaintiff and David.  (*Id.* at ¶ 6).  On or about May 10, 2006, Plaintiff asked Parsnip for a meeting between herself,

---

[2]Plaintiff states: "I would be able to call Bassage when I needed him and he would show me how to do things and then he would leave." (Pl. Aff. at ¶ 125).

Parsnip, and David. (*Id.* at ¶ 10). At the meeting, Plaintiff essentially indicated that David's expectations were unreasonable, because she was "trying her best." (*Id.* at ¶ 11-12). Plaintiff never told Parsnip that she was being harassed in the Microbiology Department because of her sex or race/national origin. (*Id.* at ¶ 14).

On or about May 9, 2006, David met with Plaintiff and delivered her performance review. David rated Plaintiff as having met expectations in four areas, and as having failed to meet expectations in eight other areas. (Def. Stmt. of Facts, ¶ 39; Pl. Appendix of Exhibits, Vol. II, Ex. S). The areas in which Plaintiff was below expectations included: 1) preparing racks of solution; 2) being responsive to the needs of lab staff; 3) being "responsive and easily approachable"; 4) being "able to multitask without getting flustered"; 5) prioritizing work; and 6) being a team player. ( Pl. Appendix of Exhibits, Vol. II, Ex. S). With regard to Plaintiff's performance, David states:

> Ms. Vito was becoming short with employees who needed solutions and media, and one person described it to me as having to 'walk on eggshells' around her. A few employees had taken to making their own media so as to avoid 'bothering' her. She was not prioritizing the [lab] work so as to meet our most immediate needs. Ms. Vito made clear that she did not like working overtime, despite the fact that the rest of the department was regularly working in the neighborhood of 94 hours in a two week period.

(David Aff. at ¶ 19). In response to David's criticisms, Plaintiff insisted that she was doing the best that she could. Additionally, Plaintiff felt that David was "not very nice," and treated her like she was "stupid." (Pl. Aff. at ¶ 148).

On May 25, 2006, Plaintiff reported for work, and "began to feel ill and worried about what may happen to [her] that day, worried that employees and supervisors would say insulting things to [her]." (Pl. Aff. at ¶ 167). Plaintiff became more upset when she learned that M1, with whom she no longer worked, and who previously had worked as a

12

temporary employee, had been hired as a full-time employee.  Later that day, Plaintiff

began to feel chest pains and shortness of breath, and left work. (Pl. Aff. at ¶ ¶ 168-

170).  Plaintiff never returned to work, and subsequently filed a worker's compensation

claim.  Defendant terminated Plaintiff's employment six months later, after she failed to

return to work.  The Microbiology Department hired a woman to replace Plaintiff.  David

states that the new employee "was fully trained on the job, and operating independently,

after a week of training. [The new employee was] able to produce the quantity of media

which Ms. Vito was unable to achieve." (David Aff. at ¶ 28).

On July 18, 2006, Plaintiff filed a discrimination complaint with the EEOC.

(Plaintiff's Appendix of Exhibits, Vol. II, Ex. C).  Plaintiff alleged that she had been

subjected to a hostile working environment based on her sex and nationality.  In that

regard, Plaintiff stated that prior to February 2006, she was "sexually harassed" by

"Goodburlet, and two other co-workers."  She further stated that after transferring to the

Microbiology Department, she was "harassed again by Brien David, and other co-

workers." (*Id.*).  On July 23, 2007, the EEOC terminated its investigation and issued

Plaintiff a right-to-sue letter.

On October 11, 2007, Plaintiff commenced this action.  The Complaint alleges

claims of hostile-work-environment sexual harassment discrimination and retaliation

under Title VII and NYHRL, and discrimination based on race and national origin, as well

as retaliation, under Section 1981.  Specifically, Plaintiff maintains that while she worked

in the Pure Vision Department, she was subjected to a hostile work environment on the

basis of sex and race/national origin.  Plaintiff further states that after she transferred to

the Microbiology Department, she was subjected to a hostile environment on the basis

of sex and race/national origin, as well as disparate treatment on the basis of race/national origin. Additionally, Plaintiff alleged that after she complained, she was subjected to retaliation in the following forms: 1) transfer to a less-desirable shift; 2) increased workload; 3) insufficient tools; 4) less opportunity; 5) unchecked harassment by co-workers; and 6) constructive discharge.

Following a period of pre-trial discovery, Defendant filed the subject motion for summary judgment [#16]. Defendant maintains that Plaintiff's allegations fail, as a matter of law, to establish an actionable claim under any of her theories. Plaintiff counters that she has actionable claims for hostile environment discrimination and retaliation.

ANALYSIS

*Rule 56*

Summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists. *See, Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). "[T]he movant must make a prima facie showing that the standard for obtaining summary judgment has been satisfied." 11 Moore's Federal Practice, § 56.11[1][a] (Matthew Bender 3d ed.). "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant may satisfy this burden by pointing to an absence of evidence to support an essential element of the nonmoving party's claim." *Gummo v. Village of*

*Depew*, 75 F.3d 98, 107 (2d Cir. 1996)(*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)), *cert denied*, 517 U.S. 1190 (1996).  Once that burden has been established, the burden shifts to the non-moving party to demonstrate "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e);  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  To carry this burden, the non-moving party must present evidence sufficient to support a jury verdict in its favor. *Anderson*, 477 U.S. at 249.  The parties may only carry their respective burdens by producing evidentiary proof in admissible form. FED. R. CIV. P. 56(e).  The underlying facts contained in affidavits, attached exhibits, and depositions, must be viewed in the light most favorable to the non-moving party. *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). However, it is well settled that the party opposing summary judgment may not create a triable issue of fact "merely by submitting an affidavit that disputes his own prior sworn testimony." *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996)(citations omitted). Rather, such affidavits are to be disregarded. *Mack v. United States*, 814 F.2d 120, 124 (2d Cir. 1987)(citations omitted).  Summary judgment is appropriate only where, "after drawing all reasonable inferences in favor of the party against whom summary judgment is sought, no reasonable trier of fact could find in favor of the non-moving party." *Leon v. Murphy*, 988 F.2d 303, 308 (2d Cir.1993).

Courts must be "particularly cautious about granting summary judgment to an employer in a discrimination case when the employer's intent is in question.  Because direct evidence of an employer's discriminatory intent will rarely be found, affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed,

would show discrimination." *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir.1997)(citations and internal quotations omitted). Nevertheless, it is "beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases." *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001). Moreover, a plaintiff may not defeat a motion for summary judgment merely by relying upon "purely conclusory allegations of discrimination, absent any concrete particulars." *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985), *cert. den.* 474 U.S. 829 (1985).

   *Title VII, NYHRL, and Section 1981*

   Title VII "makes it unlawful for an employer to discriminate against any individual with respect to the 'compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.'" *Richardson v. New York State Dep't of Correctional Servs.*, 180 F.3d 426, 436 (2d Cir. 1999)(citations omitted), *abrogated on other grounds by Kessler v. Westchester County Dept. of Soc. Servs.*, 461 F.3d 199 (2nd Cir. 2006). However, "Title VII does not establish a 'general civility code' for the American workplace. Simple teasing, offhand comments, or isolated incidents of offensive conduct (unless extremely serious) will not support a claim of discriminatory harassment." *Petrosino v. Bell Atlantic*, 385 F.3d 210, 223 (2d Cir. 2004) (citation omitted). "[C]laims brought under New York State's Human Rights Law are analytically identical to claims brought under Title VII." *Torres v. Pisano*, 116 F.3d 625, 629, n.1 (2d Cir. 1997), *cert den.* 522 U.S. 997 (1997). Claims under Section 1981, which

forbids racially-based employment discrimination,[3] are also analyzed "pursuant to Title VII principles." *Hicks v. Baines*, — F.3d —, 2010 WL 346710 at *3 (2d Cir. Feb. 2, 2010) (*citing Patterson v. County of Oneida*, N.Y., 375 F.3d 206, 225 (2d Cir.2004), *superseded in part by the* Civil Rights Act of 1991, Pub.L. No. 102-166, 105 Stat. 1071, amending 42 U.S.C. § 1981); *see also, Iuorno v. DuPont Pharmaceuticals Co.*, 129 Fed.Appx. 637, 640, 2005 WL 236618 at *1, n.4 (2d Cir. 2005) ("With regard to the *McDonnell Douglas* framework's applicability to employment discrimination claims under § 1981, . . . *Patterson* retains its precedential authority.").

*Hostile Environment*

To establish a claim of hostile work environment discrimination, a plaintiff must show that

> the harassment was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment. The plaintiff must show that the workplace was so severely permeated with discriminatory intimidation, ridicule, and insult that the terms and conditions of her employment were thereby altered. Proving such a claim involves showing both objective and subjective elements: the misconduct shown must be severe or pervasive enough to create an objectively hostile or abusive work environment, and the victim must also subjectively perceive that environment to be abusive.
>
> In addition, the plaintiff must show that a specific basis exists for imputing the objectionable conduct to the employer. Where an employee is the victim of sexual harassment, including harassment in the form of a hostile work environment, by non-supervisory co-workers, an employer's vicarious liability depends on the plaintiff showing that the employer knew (or reasonably should have known) about the harassment but failed to take

---

[3]"To establish a claim under 42 U.S.C. § 1981, plaintiff must show that (1) she is a member of a racial minority group, (2) [Defendant] intended to discriminate against her on the basis of race, and (3) this discrimination concerned one of the activities enumerated in 42 U.S.C. § 1981 . . . which include the rights to make and enforce contracts, to sue, and the right 'to the full and equal benefit of all laws and proceedings for the security of persons and property,' 42 U.S.C. § 1981." *Jenkins v. NYC Transit Auth.*, 201 Fed.Appx. 44, 45, 2006 WL 2990242 at *1 (2d Cir. Oct. 18, 2006).

appropriate remedial action. According to two 1998 Supreme Court cases, *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998), and *Faragher v. City of Boca Raton*, 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998), this inquiry differs where the harassment is attributed not to non-supervisory co-workers but to a supervisor with immediate or successively higher authority over the employee. *Burlington Indus.*, 524 U.S. at 765, 118 S.Ct. 2257; *Faragher*, 524 U.S. at 807, 118 S.Ct. 2275. In that circumstance, a court looks first to whether the supervisor's behavior culminated in a tangible employment action against the employee. If it did, the employer will, ipso facto, be vicariously liable. If no such tangible employment action is present, however, an employer will still be liable for a hostile work environment created by a supervisor unless the employer successfully establishes an affirmative defense. That defense requires the employer to show that (a) it exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.

*Fairbrother v. Morrison*, 412 F.3d 39, 48-49 (2d Cir. 2005) (citations and internal quotation marks omitted), *abrogated on other grounds by Kessler v. Westchester County Dept. of Soc. Servs.*, 461 F.3d 199 (2nd Cir. 2006).

The principles for determining whether conduct was sufficiently severe and pervasive to support a hostile environment claim are clear:

Although isolated incidents ordinarily will not rise to the level of a hostile work environment, even a single incident of sufficient severity may so alter the terms and conditions of employment as to create such an environment. The matter of whether the conduct alleged was so severe or pervasive as to create an objectively hostile or abusive work environment, is to be decided based on the totality of the circumstances, in light of such factors as the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. Where reasonable jurors could disagree as to whether alleged incidents of . . . harassment would have adversely altered the working conditions of a reasonable employee, the issue of whether a hostile work environment existed may not properly be decided as a matter of law.

*Patterson v. County of Oneida, N.Y.*, 375 F.3d 206, 227 (2d Cir. 2004) (citations and

internal quotations omitted).

In the instant case, the facts do not indicate that Plaintiff experienced a hostile work environment on the basis of sex or race/national origin. Clearly, Plaintiff subjectively felt that she was being targeted for harassment. However, the incidents that she cites are not objectively serious enough to establish a hostile environment claim. With regard to D Shift, the incidents primarily involve juvenile jokes, teasing, and crude language that in many cases was not even directed at Plaintiff. For example, M1's crude comments pertained to his own alleged sexual activity or that of other co-workers. Plaintiff was never the subject of sexual or racial epithets. Such conduct was not sufficiently severe or pervasive. *See, Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68, 126 S.Ct. 2405, 2415 (2006) (Describing "the sporadic use of abusive language, gender-related jokes, and occasional teasing" as "the ordinary tribulations of the workplace," and as "those petty slights or minor annoyances that often take place at work and that all employees experience.") (citations omitted).[4]

As for the Microbiology Department, Plaintiff maintains that the hostile environment consisted of being mocked by co-workers, being given a heavy workload, and being criticized for failing to meet the demands of her job. With regard to being mocked, Plaintiff states only that two female employees and an unidentified male employee laughed when she spoke. It is clear from the deposition transcripts that Plaintiff has some difficulty speaking English. Nevertheless, there is no indication that her co-workers mocked her because of her sex or because of her race/nationality. Nor

---

[4]The seemingly innocuous incident involving the bicycle bell does not suggest sexual or racial harassment, and if anything, suggests that Plaintiff was hyper-sensitive.

does the record indicate that such laughter was sufficiently severe of pervasive. For example, such laughter was not hostile or threatening, the persons laughing never used slurs or epithets, and there is no indication that such laughter interfered with Plaintiff's work. *See, Chancellor v. Coca-Cola Enter., Inc.*, No. C-1-08-65, 2009 WL 4674058 at *14 (S.D.Ohio Dec. 3, 2009) (Co-workers' laughter at plaintiff's accent "cannot reasonably be characterized as anything more than inappropriate teasing."). Moreover, there is no indication that Plaintiff's heavy workload, or the criticism by her supervisors, was because of her sex or race/nationality. To the contrary, the record amply demonstrates that the increased workload was due to the keratitis problem, and that the criticism was due to Plaintiff's inability to produce the desired amount of sterile solution.[5]

The alleged rude or unfriendly behavior by Goodburlet and Beaver, consisting of isolated incidents, is similarly not actionable as harassment on the basis of sex or race/national origin. *See, Brennan v. Metropolitan Opera Ass'n, Inc.*, 192 F.3d 310, 318 (2d Cir. 1999) (A supervisor's "general rude behavior" is not actionable where there is no indication that he treated women more harshly than men). Again, there is no indication that Goodburlet or Beaver was rude to Plaintiff because of her sex or race/nationality, nor was such rudeness sufficiently severe or pervasive.

The most serious hostile-environment allegations involve alleged touching by Goodburlet and David. Specifically, Plaintiff maintains that Goodburlet pushed against her on one occasion while he was looking at a machine, and that he touched her

---

[5]Plaintiff admits that she "struggled to keep up with the workload," but maintains that "she was inadequately trained and refused help on numerous occasions." (Pl. Response to Def. Stmt. of Facts, ¶ 25). However, the record indicates that Plaintiff received the same training that enabled her predecessor and her successor to meet the demands of the job, and that she failed to meet expectations even with assistance and additional training.

shoulder twice, and that on one occasion David's hand brushed against her breast while touching her arm. These alleged touches were not accompanied by any sexual comments or looks, and there is no indication that they were sexual in nature. Such isolated, minor incidents of physical contact are not sufficient to establish a hostile work environment. *See, Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 768 (2d Cir. 1998) (Dismissing hostile environment claim where supervisor told female employee that she had a "sleek ass," and deliberately touched her breasts with papers that he was holding in his hand: "Though the two incidents in question . . . are obviously offensive and inappropriate, they are sufficiently isolated and discrete that a trier of fact could not reasonably conclude that they pervaded Quinn's work environment. Nor are these incidents, together or separately, of sufficient severity to alter the conditions of Quinn's employment without regard to frequency or regularity."), *abrogated on other grounds by National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 122 S.Ct. 2061 (2002)).

For all of the foregoing reasons, Plaintiff's hostile environment claims are dismissed.

### Retaliation

Plaintiff alleges that she suffered retaliation after she complained about being harassed. The legal principles for such claims are well settled:

> "Retaliation claims under Title VII are evaluated under a three-step burden-shifting analysis." *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir.2005); *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). First, the plaintiff must establish a prima facie case of retaliation by showing: " '(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment

action.' " *Jute*, 420 F.3d at 173 (*quoting McMenemy v. City of Rochester*, 241 F.3d 279, 282-83 (2d Cir.2001)). The plaintiff's burden in this regard is " de minimis," and "the court's role in evaluating a summary judgment request is to determine only whether proffered admissible evidence would be sufficient to permit a rational finder of fact to infer a retaliatory motive." *Id*. (internal quotation marks omitted).

If the plaintiff sustains this initial burden, "a presumption of retaliation arises." *Id*. The defendant must then "articulate a legitimate, non-retaliatory reason for the adverse employment action." *Id*. If so, "the presumption of retaliation dissipates and the employee must show that retaliation was a substantial reason for the adverse employment action." *Id*. A plaintiff can sustain this burden by proving that "a retaliatory motive played a part in the adverse employment actions even if it was not the sole cause[;] if the employer was motivated by retaliatory animus, Title VII is violated even if there were objectively valid grounds for the [adverse employment action]." *Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d Cir.1990).

*Hicks v. Baines*, 2010 WL 346710 at *3. An "adverse employment action" means "employer actions that would have been materially adverse to a reasonable employee or job applicant . . . . Actions are 'materially adverse' if they are harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Id*. at *4 (citations omitted).

In deciding whether an employment action is sufficiently adverse, the plaintiff's subjective beliefs are irrelevant. *Gelin v. Paulson*, No. 05-6043-cv, 234 Fed.Appx. 5, 2007 WL 1366325 at *7 (2d Cir. May 10, 2007) (Finding that an objectively positive performance evaluation was not an adverse employment action, the court observed that Title VII's "provisions for judging harm must be objective," and accordingly, the court found that the plaintiff's "subjective belief that he was 'downgraded' [was] irrelevant.") (citations omitted); *see also*, *Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 128 (2d Cir. 2004) ("[S]ubjective, personal disappointments do not meet the objective indicia of

an adverse employment action.") (citation omitted).

In this case, Plaintiff contends that she suffered retaliation in the Pure Vision Department and in the Microbiology Department. In the Pure Vision Department, Plaintiff states that, after she complained about Goodburlet, Rock, and M1, she experienced retaliation in the form of continued harassment. In that regard, she states that co-workers talked about her and laughed at her, and that one employee gave her a "hard time" concerning the inspection of a contact lens. Clearly, "unchecked retaliatory co-worker harassment, if sufficiently severe, may constitute adverse employment action." *Richardson v. New York State Dep't of Correctional Servs.*, 180 F.3d at 446. However, the mild behavior upon which Plaintiff relies is not sufficiently severe to qualify as an adverse employment action. Even assuming that the conduct was sufficiently severe, there is no indication that Plaintiff notified Defendant that she was suffering such retaliatory harassment. *See, Id*. ("An employee could suffer a materially adverse change in the terms and conditions of her employment if her employer *knew about* but failed to take action to abate retaliatory harassment inflicted by co-workers.") (emphasis added). Nor does there appear to be any causal connection between Plaintiff's complaint and the incident involving the inspection of the contact lens.

To the extent that Plaintiff claims she was transferred to a less desirable shift in retaliation for complaining, her complaint also fails. There is no indication that she was transferred to a less desirable shift, since C Shift was essentially identical to D Shift in terms of job duties, hours, and pay. Moreover, Plaintiff asked to be transferred to C Shift.

In the Microbiology Department, plaintiff maintains that the retaliation took the

23

form of harassment and constructive discharge. With regard to alleged retaliatory harassment, Plaintiff relies on the same alleged incidents of harassment upon which she bases her hostile environment claim. As for constructive discharge, Plaintiff states that the constructive discharge consisted of increased workload and criticism of her work performance. More specifically, Plaintiff contends that the alleged hostile environment in the Microbiology Department effected the constructive discharge. (*See*, Pl. Memo of Law at 20) (*citing Pennsylvania State Police v. Suders*, 542 U.S. 129, 124 S.Ct. 2342 (2004)).

At the outset, it is clear that Defendant did not constructively discharge Plaintiff. Rather, Plaintiff quit her job after becoming physically ill, as a result of her worries over the job and her anger over the fact that M1 was hired as a full-time employee. It bears mentioning again that, at the time, Plaintiff was not even working in the same building with M1. In any event, Plaintiff's allegations of constructive discharge fail to state an adverse employment action. There was no hostile work environment, and hence there was no hostile-environment constructive discharge. *See, Pennsylvania State Police v. Suders*, 542 U.S. at 149, 124 S.Ct. at 2356 ("Creation of a hostile work environment is a necessary predicate to a hostile-environment constructive discharge case."). Moreover, there is no evidence of a causal connection between Plaintiff's complaints and the increased workload and criticism about her performance. Further, as discussed above, the increased workload and criticism were unrelated to Plaintiff's sex or race/national origin.

*Disparate Treatment*

It appears that Plaintiff was initially attempting to assert a disparate treatment claim, based on her dissatisfaction with the size of her cubicle and the fact that she was not given a personal computer. In regard to such claim, "[a] plaintiff establishes a prima facie case of [disparate treatment] discrimination by showing that he or she (1) is a member of a protected [group] . . . .; (2) was qualified to perform the duties required by the position; (3) was subjected to an adverse employment action; and (4) the adverse employment action occurred in circumstances that gave rise to an inference of discrimination." *Butts v. NYC Dept. of Housing Preservation and Dev.*, No. 07-1930-cv, 307 Fed.Appx. 596, 2009 WL 190403 at *1-2 (2d Cir. Jan. 28, 2009) (citations omitted). It now appears that Plaintiff has abandoned her disparate treatment claim. In any event, the Court would dismiss the claim, since Plaintiff cannot demonstrate that she suffered an adverse employment action, or that such adverse action took place under circumstances giving rise to an inference of discrimination.

CONCLUSION

For the foregoing reasons, Defendants' summary judgment motion [#16] is granted and this action is dismissed.

SO ORDERED.

Dated: Rochester, New York
　　　 February 27, 2010

ENTER:


/s/ Charles J. Siragusa_____
CHARLES J. SIRAGUSA
United States District Judge